DAVID C. REED, TRUSTEE, &c., PLAINTIFF AND APPPEL-
LANT, v. MARCUS SASLAFF, DEFENDANT AND AP-
PELLEE.

Submitted March 19, 1909—Decided September 24, 1909.

An agreement between certain rolling chair proprietors in Atlantic
City to maintain a fixed schedule of rates for service is not void
as contrary to public policy, where it appears that such schedule
of rates is exactly the same as the maximum rates fixed for such
service by the ordinance of the city, and that such rates are
reasonable, and where it does not appear that the parties to the
agreement have a monopoly of the business in that community.

On appeal from the Atlantic City District Court.

Before Justices REED, TRENCHARD and MINTURN.

For the appellant, *Eli H. Chandler.*

For the appellee, *Joseph B. Perskie.*

The opinion of the court was delivered by

TRENCHARD, J.    The plaintiff below brought this action in
the Atlantic City District Court against Marcus Saslaff to
enforce payment of the sum of $250, being the penalty in an
agreement entered into between the plaintiff and the de-
fendant.

The trial before the judge, sitting without a jury, resulted
in a judgment for the defendant, which judgment is now here
for review.

Upon the trial it appeared that the plaintiff as well as the
defendant and others were severally the proprietors and
owners of roller chairs in Atlantic City, and that they, on the
one part, and the plaintiff, as trustee, on the other part, en-
tered into a written agreement wherein the defendant cove-
nanted to pay the sum of $250 to the plaintiff, as trustee for
the Atlantic City Hospital, in the event that the defendant

failed to "faithfully observe, maintain and carry out, without any equivocation, reservation or rebates, secret or otherwise," the fixed schedule of rates of fare therein set forth for the hire of roller chairs in Atlantic City.

The breach of this covenant was established at the trial by proof, but the learned trial judge gave judgment for the defendant upon the theory that the covenant in question was contrary to public policy and void. That was the sole defence interposed at the trial and none other is suggested here.

We think the view of the trial judge was erroneous. He seems to have regarded the case as controlled by *Trenton Potteries Co.* v. *Oliphant,* 13 *Dick. Ch. Rep.* 507, in that the agreement was one between independent and unconnected owners of rolling chairs looking to the control of rates for service by an express agreement to maintain specified rates, and so against public policy. But we think that case is not applicable to the case at bar for the reasons we will now state.

At the trial there was admitted in evidence an ordinance of Atlantic City entitled "An ordinance regulating and prescribing the fees to be charged persons carried in invalid or rolling chairs within the limits of Atlantic City," approved July 17th, 1905. This ordinance by its terms fixed the maximum rates for hire of the various kinds of rolling chairs. It appears that the maximum rates thus fixed by ordinance are exactly the same as the rates provided for in the agreement between the plaintiff and defendant.

The power of Atlantic City to pass the ordinance fixing such maximum rates is not challenged. The city charter of Atlantic City (*Pamph. L.* 1902, *p.* 293) authorizes the city council by ordinance to license and regulate carriages and vehicles used for the transportation of passengers, and to fix fees for such licenses. Moreover the power to fix the fares to be charged was abundantly conferred upon city council by various statutes, viz., by a supplement to the original charter, approved March 13th, 1866; by another supplement, approved March 22d, 1871, and by a general act applicable to all cities, approved May 16th, 1894. *Gen. Stat., p.* 2236, § 532. *Fonsler* v. *Atlantic City,* 41 *Vroom* 125. And by sec-

tion 115 of the present charter (*Pamph. L.* 1902, *p.* 341) such power was expressly reserved. *Conover* v. *Atlantic City,* 44 *Vroom* 596.

The trial judge found as a fact that the maximum rates fixed by the ordinance and adopted in the agreement "were reasonable rates of fare, and that a maintenance of such rates would result in the acquirement of but reasonable benefit for the services performed." Under these circumstances it is not perceived how the covenant in question is against public policy. It is too plain for argument that the policy of the law is not violated by an agreement whereby some (not all) of the owners of such vehicles in Atlantic City contracted to maintain rates which were permitted by the law-making power and which are found to be reasonable as a matter of fact.

In *Raritan River Railroad Co.* v. *Traction Company,* 41 *Vroom* 732, the Court of Errors and Appeals had under review section 15 of the General Railroad law of 1873 (*Gen. Stat., p.* 2643), which in effect vested in the railroad company an uncontrolled discretion to establish such rates of freight and fare as its own interests from time to time required, subject only to the maximum rates prescribed by the section, and to the reserved right of repealer and modification by the legislature, and the court held—*first,* that the courts have no general supervisory jurisdiction over the question of freight and passenger rates, and *second,* that an agreement made between a railroad company and a competitor that during a limited period the former company "will not reduce its present rates of fare unless required by law" is not contrary to public policy as established in this state.

In that case Mr. Justice Pitney (the present Chancellor), speaking for the court, said: "Public policy is to be sought for in the rules of the common law, as modified by the acts of the legislature. It is for the law-making authority, and not for the courts, to declare it. Certainly the courts have no general supervisory authority over the question of freight and passenger rates. Their concern in the matter is confined to cases where the question of 'reasonable rates' is raised inci-

dentally, in the ordinary course of judicial inquiry. Railroad companies, as common carriers, pursuing a public calling under such circumstances that the public must of necessity deal with them, are limited by the rules of the common law, in the absence of any statute, to the imposition of reasonable rates of fare and toll. On the additional ground that their property is devoted to a public use, they are subject to the like limitation, and their use of the property is subject to be controlled by the public for the common good, within limits fixed by the constitution. Where controversies arise *inter partes,* the courts judicially determine what are reasonable rates. In so doing, they follow common-law rules in the absence of statute; where there is a statute the courts follow the rule of law thus prescribed; where the statute violates the constitution, as by prescribing rates so low as to be unremunerative, so as to amount to a taking of property without compensation or without due process of law, the courts follow the constitution, disregarding the statute (citing cases). But the power to require a public service to be performed for a limited rate is but a branch of the power to regulate, in the public interest, property that is devoted to the public use. This is primarily the function of the law-making body. The courts may, in a given instance, be called upon to decide, in the course of litigation, whether a certain rate is reasonable or unreasonable, or to declare that a given statutory limitation is confiscatory, but the courts have no power to declare in general what rates shall not be exceeded. In view of the positive statutory declaration contained in section 15 of the General Railroad law, construed as we construe it, we are unable to conceive on what rational ground the court can properly declare that any public policy requires that the rates shall be maintained below the maximum rates fixed in the statute. That limitation, and the discretion that is conferred upon the company with respect to lesser rates, are the deliberate expression of the law-making power, and the measure of its regulation in this behalf of property devoted to public use under the General Railroad law. That statute

binds the court unless it transcends some constitutional limitation. Nothing of the sort is suggested."

We think the decision of that case, and the reasoning by which it is supported, decisive of the case at bar.

The contention of the defendant that the effect of the agreement in question is to create a monopoly, and that it thus contravenes public policy is not supported either by the terms of the agreement itself nor by the evidence. It does not appear that the parties to this contract are in control, or anything like control, of the rolling chair business in Atlantic City. There is nothing to show that they comprise more than the most insignificant part or fraction of those engaged in the business in that community. It does appear that others are engaged in the business there. We are not at liberty to indulge in inferences which would restrict rights under a contract. Parties are to be given the widest latitude to make contracts with reference to their private interests and the invalidity of such contracts is never to be inferred, but must be clearly made to appear. What the effect would be upon the agreement in question of proof tending to show control of the business in that community it is unnecessary now to decide, because, as we have pointed out, there is no such proof.

The agreement in question not being contrary to public policy, the judgment of the court below must be reversed and a *venire de novo* awarded.